[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-11845
_____

D.C. Docket No. 1:13-cr-20641-KMM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

LOURDES MARGARITA GARCIA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(October 19, 2018)

Before MARCUS and WILSON, Circuit Judges, and GRAHAM, District Judge.[*]

_____

[*]Honorable James L. Graham, United States District Judge for the Southern District of Ohio,
sitting by designation.

MARCUS, Circuit Judge:

This is a troubling case. There can be no doubt -- and the government does not contest the point -- that constitutional error occurred. It is also clear that the error was plain and obvious. The decision to allow the government to introduce inculpatory evidence while both the defendant and her lawyer were absent for three to ten minutes in a trial that lasted more than 49 hours violated the defendant's right to counsel, her right to confront the witnesses arrayed against her, and her right to be present at trial under both the Due Process Clause and Fed. R. Crim. P. 43. The only question is whether Garcia's convictions should be reversed on account of the error.

We hold that Garcia's convictions must be affirmed because the errors did not affect Garcia's substantial rights. There can be no question that Garcia failed to preserve the errors at trial even though she had ample opportunity to do so. She was given every chance to object and to secure some remedial relief from the trial court but expressly declined to act. As a consequence, under well-established law we must review the constitutional violations that occurred for plain error, not for harmlessness beyond a reasonable doubt. What's more, there is good reason in this case to be punctilious in selecting the proper standard of review. The prejudice analysis is by no means clear-cut and the standard by which we measure it could well make all the difference.

2

We also reject Garcia's other challenges to her convictions based on the sufficiency of the indictment and claimed errors in the jury instructions. The indictment was plainly adequate, and, to the extent that the district court may have erred in how it charged the jury, these errors did not prejudice Garcia's defense. Finally, we hold that Garcia has similarly failed to establish prejudice under the doctrine of cumulative error.

I.

A grand jury sitting in the Southern District of Florida indicted Lourdes Margarita Garcia for conspiring from 1997 to September 2008 with her husband Angel Garcia and others to defraud the United States by impeding the Internal Revenue Service (IRS) in the assessment and collection of federal income taxes, and to commit offenses against the United States by willfully making false personal income tax returns for 1997 and 2001-2007, all in violation of 18 U.S.C. § 371, (Count One). Garcia and her husband were also charged with three substantive counts of making and subscribing false personal income tax returns for tax years 1997, 2006, and 2007, in violation of 26 U.S.C. § 7206(1) (Counts Two, Three, and Four). Garcia's husband, Angel, died before the case was tried.

The evidence adduced at trial established that Garcia and her husband had long been active as healthcare providers in South Florida. Beginning in the early 1990s, the couple operated various medical clinics and diagnostic centers, which

generated substantial income that they reported to the IRS through 1996. After business reversals and unsuccessful litigation in the Tax Court resulting in tax deficiencies for 1992 and 1994-1996, the Garcias filed for protection in bankruptcy court. Garcia continued to work as a physician's assistant in her medical clinics. She holds a medical degree that she obtained in the Dominican Republic -- the country of her birth -- and a physician's assistant license from the state of Florida. Sometime later, beginning in 2001, the Garcias began to operate Global Medical Group (Global), a new medical clinic based in Miami, first as a general partnership and then as a limited liability company. For federal income tax purposes, as a general partnership and then as a Subchapter S corporation, these were pass-through entities, the profits of which were passed through to the Garcias and reportable on their personal income tax returns.

The evidence undisputedly established that Global generated substantial income. In particular, it produced, at a minimum, $40,000 for 2001, $40,000 for 2002, $150,000 for 2003, $300,000 for 2004, $280,000 for 2005, and $1,986,882 for 2006. These figures were proven at trial through, among other things, the introduction of extensive documentary evidence, including Global's bank accounts and records reflecting the receipt of large sums of money from various health insurance companies and patients.

The evidence also established that very little of this income was reported on the Garcias' Form 1040 returns. Thus, for years 1997, 2001, 2002, 2003, 2004, and 2005 the Garcias reported no income. For 2006 they reported only $19,980 in taxable income, and for 2007 they reported $29,111.

Since Global was a Subchapter S corporation, not all of its gross income was passed through and includable on the Garcias' tax returns as personal income. Only its net profits were classed as personal income. To determine how much of Global's income was passed through to the Garcias, the IRS conducted an extensive examination of the monies flowing into and out of Global's five bank accounts. Going account by account and expenditure by expenditure, IRS investigators analyzed the transactions and characterized some of them as being personal in nature based on how the monies were expended. Trial exhibits, including elaborate schedules of these expenditures showed the amounts associated with each transaction, as well as, in some cases, who initiated the transaction. Moreover, IRS agents examined various checks drawn on Global's accounts and testified at trial that many of them were signed by Garcia or made out to cover expenses that benefited her and her family. These checks were also introduced in evidence.

Based, in part, on their analysis of personal expenditures drawn on Global's bank accounts, IRS investigators concluded that the Garcias' personal income for

5

2006 and 2007 was well above what they reported on their Form 1040 returns. For 2006, the investigators concluded that the Garcias had realized $403,309 in taxable income, yielding a tax due of $114,332. And their taxable income for 2007 was calculated as $452,779, with an additional tax due of $130,679. The United States also introduced bankruptcy filings the Garcias made in 1997 establishing that they had a taxable income of nearly $90,000 that year, even though their 1997 return reported no income.

The trial lasted some 10 days and included testimony taken from 26 witnesses and thousands of pages of documents. Of special importance for our purposes are the testimony of and exhibits introduced through Angela Arevalo, an IRS Revenue Agent who extensively investigated the Garcias' financial dealings. Arevalo was the 23rd and last witness called by the United States on the sixth day of trial. Among other things, she testified about and the court received in evidence Government Exhibit 6, a detailed schedule of expenditures prepared by the IRS summarizing the payment of money drawn on Global's bank accounts by and for the personal benefit of the Garcias in 2006 and 2007. Because Global was a pass-through entity, these personal expenditures should have been reported, the agent offered, as income on their personal returns.  They were not reported in 2006 and 2007. Plainly, Exhibit 6 was an important piece of evidence establishing that the Garcias had underreported their taxable income and the taxes due and owing to the

6

United States. Notably, the background information about Exhibit 6 was elicited on direct examination from Arevalo while Garcia and her counsel were present, shortly before the trial court recessed for lunch.

After lunch, however, the prosecution resumed its examination of Arevalo before the defense team had returned to the courtroom. During the course of this three to ten minute period -- counsel having been absent for some three minutes and the defendant for as much as ten minutes -- Arevalo highlighted ten specific expenditures contained in Exhibit Six. The expenditures consisted of a debit transaction for $832 paid to El Dorado Furniture; a check written by Lourdes Garcia and made payable to her niece Sally Landron in the amount of $9,550; a check for $9,310.50 made out to cash; another debit transaction for $2,500 payable to El Dorado Furniture; a check made out to Lourdes Garcia for $9,000; a debit card transaction for $464.71 payable to Macy's; a debit card transaction for $1,750 payable to Victory Racing Engines; a check payable to Angel Garcia in the amount of $45,000; a check in the amount of $3,260 payable to EMC Mortgage; and a check in the amount of $56,261.53 made out to Williamson Cadillac for a Hummer vehicle.

These ten items represented a small sampling of nearly 400 personal expenditures found in the exhibit. When added together, they represent $137,928.74 worth of expenditures in an exhibit that accumulated a total of

7

$1,561,854.19 in personal expenditures drawn on Global's bank accounts in 2006 and 2007. During their absence, Arevalo also offered her lay opinion that one of the checks disposing of funds drawn from the Global accounts that was signed "A. Garcia" -- presumably short for Angel Garcia, the defendant's deceased husband -- was actually signed by the defendant, Lourdes Margarita Garcia. In all, the missed testimony takes up some six pages of the trial transcript, out of a total of 1,559 pages, and consists of 43 questions. Following this testimony, the prosecution concluded its direct examination, and Garcia's counsel, in the presence of the defendant, began her cross-examination of Arevalo.

Counsel did not raise any objection when she returned to the courtroom in the middle of Arevalo's testimony. Nor did she lodge an objection the following trial day during an extensive sidebar colloquy called for the explicit purpose of discussing the introduction of inculpatory evidence in the defense team's absence. Indeed, counsel expressly declined to state any objection at that time although given an extended opportunity to do so.

After the government rested, Garcia took the stand in her own defense. She denied having any knowledge of Global's or her family's finances. Rather, she explained, her husband took care of all of the family's financial business. She claimed ignorance of the amount of income generated by Global, and also testified that she was unaware of the amounts reported on her tax returns, even though she

8

admitted to signing some of them. Moreover, the appellant's daughter and son also testified in a similar vein, offering that the affairs of the business and the tax returns were handled by their father, Angel Garcia.

The jury returned a guilty verdict on all four counts. Garcia then moved for a new trial on the grounds that the introduction of inculpatory evidence in their absence violated the Fifth and Sixth Amendments to the Constitution. The district court denied the motion, concluding that Garcia had voluntarily absented herself from trial, and that, in any event, any error did not prejudice her defense.

Thereafter, Garcia was sentenced to 51 months' imprisonment on Count One and 36 months' imprisonment on Counts Two, Three, and Four -- all of the terms to run concurrently. The district court also imposed three years of supervised release and ordered Garcia to pay $455,683.74 in restitution to the IRS.

This timely appeal followed.

## II.

We necessarily begin our analysis with an examination of the proper standard of review against which to measure the most serious errors raised in this case: the absence of the defendant and her counsel for some three to ten minutes during which inculpatory evidence was presented to the jury. For errors of constitutional magnitude, the law offers three standards against which to measure prejudice. The first one -- urged by appellant -- is the doctrine of structural error

which requires us to presume prejudice in the face of certain, exceptional errors, that erode the fundamental integrity of the entire trial process. Second, we may measure constitutional mistakes against the standard of harmlessness beyond a reasonable doubt as enunciated by the Supreme Court in Chapman v. California, 386 U.S. 18 (1967). This standard offers the defendant relief unless the United States can establish harmlessness beyond a reasonable doubt. Finally, we may review unpreserved error for plain error when the defendant has failed to preserve the issue by unambiguously flagging the mistake and contemporaneously objecting. [1]   After careful review, on this record we conclude that plain error is the template against which to measure prejudice. Under this standard, Garcia suffered no prejudice.

## A.

The appellant argues that structural error applies and prejudice must be presumed. Mrs. Garcia emphasizes that both she and her counsel were absent during the introduction of inculpatory evidence, which makes the errors especially egregious. However, it is clear from our decision in United States v. Roy, 855 F.3d 1133 (11th Cir. 2017) (en banc), cert. denied, 138 S. Ct. 1279 (2018), that the

---

[1] A fourth possible measure of prejudice is a standard suggested, but not adopted by the Supreme Court in Brecht v. Abrahamson, 507 U.S. 619, 638 n. 9 (1993) ("[I]n an unusual case, a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict."). We have never recognized this standard -- known as "hybrid error" -- and decline to do so here.

errors we face in this case cannot be treated as structural. In <u>Roy</u>, just like in this case, we were confronted with a serious mistake that consisted of the introduction of inculpatory evidence in the defense counsel's absence. As we explained there, the error was not structural, in no small measure, because the absence was so brief, consisting of only seven minutes, or one half of one percent, of a trial that lasted 31.4 hours and because the offending questions and answers that were elicited in counsel's absence were reprised in even greater detail soon thereafter in counsel's presence. <u>Id</u>. at 1165-66.

The error here is similar, at least in some ways, to the one in <u>Roy</u>, and in some ways the error is an even less eligible candidate for being treated as structural. While Garcia herself was absent from trial for between five to ten minutes, her lawyer was absent for only three. This represents only .33535 percent of the trial's 49.7 hours. Moreover, we know almost exactly what questions and answers were elicited in their absence. "This factor [] bear[s] heavily on whether to presume prejudice or give the government an opportunity to show beyond a reasonable doubt the lack of it, because in determining if the defense was prejudiced because of something counsel missed, it helps a lot to know what counsel missed." <u>Id</u>. at 1162. Although the error here was in another sense more serious than in <u>Roy</u> because both the defendant and her lawyer were absent, at least

11

for a very small part of the testimony, that is not enough reason to treat the error as structural.

As we recognized in Roy -- and as the Supreme Court has held over and over -- "the vast majority of constitutional errors that occur at a criminal trial, including Sixth Amendment violations, should be examined for prejudicial effect and those errors do not require reversal if they are harmless." Id. at 1167. Only in rare circumstances do we presume error, characterize it as structural, and eliminate the requirement to establish actual prejudice. Johnson v. United States, 520 U.S. 461, 468 (1997) ("We have found structural errors only in a very limited class of cases."). Thus, for example, we presume prejudice for the complete denial of counsel at a critical stage, and for other errors that "defy analysis by harmless-error standards because they affect the framework within which the trial proceeds." United States v. Gonzalez-Lopez, 548 U.S. 140, 148 (2006) (quotations and alterations omitted). Structural errors are errors that violate constitutional safeguards "whose precise effects are unmeasurable, but without which a criminal trial cannot reliably serve its function." Sullivan v. Louisiana, 508 U.S. 275, 281 (1993). These errors completely undermine the reliability of a trial to serve "as a vehicle for determination of guilt or innocence." Rose v. Clark, 478 U.S. 570, 577–78 (1986).

12

Sound considerations of judicial policy show why we rarely treat an error as structural. First, "[r]eversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it." Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986) (quoting Roger Traynor, The Riddle of Harmless Error 50 (1970)). If all errors resulted in reversal, trials would take place in the shadow of "a sporting theory of justice and a regime of gotcha review." Roy, 855 F.3d at 1142 (quotation omitted). What's more, automatic reversal is unnecessary in most cases. As the Supreme Court has recognized, "given the myriad safeguards provided to assure a fair trial, and taking into account the reality of the human fallibility of the participants, there can be no such thing as an error-free, perfect trial, and [] the Constitution does not guarantee such a trial." United States v. Hasting, 461 U.S. 499, 508–09 (1983). "Because errorless trials are not expected, much less required, harmless error analysis is the rule, not the exception." Roy, 855 F.3d at 1143. After all, the "central purpose of a criminal trial is to decide the factual question of the defendant's guilt or innocence," Van Arsdall, 475 U.S. at 681, which means that, if the error can be "quantitatively assessed in the context of other evidence presented in order to determine whether its admission [was] harmless," we need not presume prejudice but rather can apply the harmless error rule. Arizona v. Fulminante, 499 U.S. 279,

13

308 (1991). Further, doing so allows us to "conserv[e] scarce judicial resources by avoiding pointless retrials." Roy, 855 F.3d at 1142.

Moreover, to suggest that harmless error review is entirely toothless, or that treating an error as structural is the only way to afford a defendant meaningful relief, ignores the important role the rule plays in ensuring that defendants receive a fair and accurate trial. That harmless error review acts as an adequate safeguard in most cases should be apparent from the fact that the Supreme Court has applied it to a wide variety of violations of fundamental constitutional rights. See, e.g., Clemons v. Mississippi, 494 U.S. 738, 752-754 (1990) (unconstitutionally overbroad jury instructions at the sentencing stage of a capital case); Satterwhite v. Texas, 486 U.S. 249 (1988) (admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause); Carella v. California, 491 U.S. 263, 266 (1989) (jury instruction containing an erroneous conclusive presumption); Pope v. Illinois, 481 U.S. 497, 501-504 (1987) (jury instruction misstating an element of the offense); Rose v. Clark, 478 U.S. 570 (1986) (jury instruction containing an erroneous rebuttable presumption); Crane v. Kentucky, 476 U.S. 683, 691 (1986) (erroneous exclusion of defendant's testimony regarding the circumstances of his confession); Delaware v. Van Arsdall, 475 U.S. 673 (1986) (restriction on a defendant's right to cross-examine a witness for bias in violation of the Sixth Amendment Confrontation Clause); Rushen v. Spain, 464

14

U.S. 114, 117-118 & n. 2 (1983) (denial of a defendant's right to be present at trial); United States v. Hasting, 461 U.S. 499 (1983) (improper comment on defendant's silence at trial, in violation of the Fifth Amendment Self–Incrimination Clause); Hopper v. Evans, 456 U.S. 605 (1982) (statute improperly forbidding trial court's giving a jury instruction on a lesser included offense in a capital case in violation of the Due Process Clause); Kentucky v. Whorton, 441 U.S. 786 (1979) (failure to instruct the jury on the presumption of innocence); Moore v. Illinois, 434 U.S. 220, 232 (1977) (admission of identification evidence in violation of the Sixth Amendment Counsel Clause); Brown v. United States, 411 U.S. 223, 231-232 (1973) (admission of the out-of-court statement of a nontestifying codefendant in violation of the Sixth Amendment Counsel Clause); Milton v. Wainwright, 407 U.S. 371 (1972) (confession obtained in violation of Massiah v. United States, 377 U.S. 201 (1964)); Chambers v. Maroney, 399 U.S. 42, 52-53 (1970) (admission of evidence obtained in violation of the Fourth Amendment); Coleman v. Alabama, 399 U.S. 1, 10-11 (1970) (denial of counsel at a preliminary hearing in violation of the Sixth Amendment Confrontation Clause).[2] It is therefore apparent that structural error generally is neither essential, nor even the optimal way of dealing with most trial mistakes.

---

[2] This list is drawn from Arizona v. Fulminante, 499 U.S. 279, 310 (1991).

15

This case illustrates the point. An examination of the entire record does not remotely suggest the complete denial of counsel or the breakdown of the trial process. Nor do the errors defy analysis because their impact is unmeasurable. These mistakes, like so many others, can be quantitatively assessed when measured against the other evidence presented. Although the errors cannot be treated as structural, that by no means decides the outcome. While Garcia ultimately cannot carry her burden under the plain error standard, the outcome may well have been different if trial counsel had preserved the errors. Harmless error review is not a dead end. The rule, like the judicial process itself, is practical and perfectly workable.

## B.

The constitutional errors here are trial errors. Thus, normally, we would ask whether the government had met its burden of establishing that the errors were harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24 (1967). But if a defendant fails to lodge a timely objection, we are required to apply plain error review instead. See, e.g., United States v. Turner, 474 F.3d 1265, 1275 (11th Cir. 2007) ("Normally, we would review issues concerning a district court's evidentiary rulings . . . for harmlessness beyond a reasonable doubt . . . . However, it is well-settled that where, as here, a defendant fails to preserve an evidentiary ruling by contemporaneously objecting, our review is only for plain

16

error.") (citations omitted); United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir. 2005) (explaining that, because the defendant did not preserve a sentencing issue by objecting in the district court, review was only for plain error); United States v. Humphrey, 164 F.3d 585, 587 (11th Cir. 1999) ("The appropriate standard of review, given [the defendant's] failure to object in the district court . . . is plain error.").

Unlike harmless error review, "[u]nder plain error review, which is authorized by Fed.R.Crim.P. 52(b), federal appellate courts have only 'a limited power to correct errors that were forfeited because [they were] not timely raised in [the] district court.'" Rodriguez, 398 F.3d at 1298 (quoting United States v. Olano, 507 U.S. 725, 731 (1993)). "Although a rigid and undeviating judicially declared practice under which courts of review would invariably and under all circumstances decline to consider all questions which had not previously been specifically urged would be out of harmony with the rules of fundamental justice, the authority created by Rule 52(b) is circumscribed." Olano, 507 U.S. at 732 (quotation and citation omitted and alterations adopted).

Thus, an appellate court conducting plain error review may only correct an unpreserved claim if the defendant proves "(1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error

17

seriously affects the fairness, integrity, or public reputation of judicial proceedings." Rodriguez, 398 F.3d at 1298 (quotations and citations omitted). Notably, this standard differs from harmless error review in important respects. Turner, 474 F.3d at 1275 ("Plain-error review differs from harmless-error review in both purpose and scope."). For starters, relief under plain error review is discretionary, meaning that, even if a defendant establishes prejudice, her convictions might still be affirmed. United States v. Vonn, 535 U.S. 55, 63 (2002). Recently, in Rosales-Mireles v. United States, 138 S. Ct. 1897 (2018), the Supreme Court elaborated on when it is appropriate to exercise such discretion, observing that "[i]t is crucial in maintaining public perception of fairness and integrity in the justice system that courts exhibit regard for fundamental rights and respect for prisoners as people," and that errors that demonstrate a disregard for those rights warrant reversal where they satisfy the other requirements of plain error review. Id. at 1907 (quotations omitted). In addition, unlike harmless error -- where the government carries the burden -- the onus of establishing prejudice under plain error rests with the defendant. United States v. Monroe, 353 F.3d 1346, 1352 (11th Cir. 2003).

The measure of prejudice under plain error review -- the third prong of the plain error test -- "requires that an error have affected substantial rights, which almost always requires that the error must have affected the outcome of the district

18

court proceedings. The standard for showing that is the familiar reasonable probability of a different result formulation." Rodriguez, 398 F.3d at 1299 (quotations and citations omitted). This means that to establish prejudice on plain error, the defendant must show there is a reasonable probability that, but for the error, a different outcome would have occurred; and a reasonable probability is a probability "sufficient to undermine confidence in the outcome." United States v. Dominguez Benitez, 542 U.S. 74, 83 (2004) (citing Strickland v. Washington, 466 U.S. 668, 694 (1984)). We make this calculus "by weighing the record as a whole, examining the facts, the trial context of the error, and the prejudice created thereby as juxtaposed against the strength of the evidence of defendant's guilt." United States v. Hands, 184 F.3d 1322, 1329 (11th Cir. 1999) (quotations and citations omitted).

The burden placed on the defendant under plain error is heavy. As we have said, "the plain error test is difficult to meet, and in particular, the burden of showing prejudice to meet the third-prong requirement is anything but easy." United States v. Shelton, 400 F.3d 1325, 1331–32 (11th Cir. 2005) (quotations omitted). It is, quite simply, a far less defendant-friendly standard than harmless error. See Dominguez Benitez, 542 U.S. at 86-87 (Scalia, J., concurring).

The heavy burden imposed on the defendant serves to enforce the "contemporaneous objection rule" -- the basic requirement that parties assert

timely objections in order to preserve claims of error. See Rodriguez, 398 F.3d at 1298. "The purpose of [the contemporaneous objection] rule is to assure that the trial judge makes an informed decision, and to allow the judge and opposing counsel to take whatever corrective action is needed." United States v. Astling, 733 F.2d 1446, 1459 (11th Cir. 1984). The rule aims to provide the district court with an opportunity to prevent or correct error, and thus avoid the costs of reversal and retrial. Turner, 474 F.3d at 1275. It "fosters finality of judgment and deters 'sandbagging,' saving an issue for appeal in hopes of having another shot at trial if the first one misses." United States v. Rodriguez, 627 F.3d 1372, 1379 (11th Cir. 2010). Requiring timely objections also promotes respect for a criminal trial as a "decisive and portentous event," and enables the district court to develop a full record on the issue. Id.

The daunting hurdles erected under plain error review are imposed for powerful reasons. Without them, a defendant would be free to sleep on his rights at trial, and ignore his duty in our adversarial system to help the district court police the trial process in order to ensure fair and accurate fact-finding. See United States v. Lopez-Pena, 912 F.2d 1542, 1546 (1st Cir. 1989) ("Ordinarily, the law ministers to the vigilant, not to those who sleep upon their rights."). Under our common law tradition of trial by adversarial testing, generally it is not the role of the judge to step in and correct a party's mistake or do her work for her. See McNeil v.

Wisconsin, 501 U.S. 171, 181 n. 2 (1991) ("What makes a system adversarial rather than inquisitorial is… the presence of a judge who does not (as an inquisitor does) conduct the factual and legal investigation himself, but instead decides on the basis of facts and arguments pro and con adduced by the parties."); Sanchez-Llamas v. Oregon, 548 U.S. 331, 357 (2006) ("In an inquisitorial system, the failure to raise a legal error can in part be attributed to the magistrate, and thus to the state itself. In our system, however, the responsibility for failing to raise an issue generally rests with the parties themselves."). Indeed, if a litigant doesn't think an error is important enough to lodge an objection, it is less likely the trial judge will disagree and take action on his own. It is, therefore, a principle central to our system that a defendant who through laxity or, worse, deliberate gamesmanship fails to preserve an error at trial cannot expect relief on appeal absent a robust showing of prejudice.

Unlike in Roy, here we cannot indulge the assumption that the proper standard to apply in reviewing the error is harmlessness beyond a reasonable doubt. In Roy, we applied the harmless error rule because, among other things, it was unclear from the record whether defense counsel took any ameliorative actions after returning to the courtroom. Roy, 855 F.3d at 1141-42. We put it this way: "[a]bsent any knowledge of why defense counsel was absent, whether the AUSA or judge realized he was not present, about what counsel realized or didn't when he

21

walked in late, and about whether he took some ameliorative action not reflected in the transcript, we will not apply the plain error rule or remand for any findings necessary to decide if it is applicable. Instead, in order to simplify our analysis, we will indulge the assumption that the plain error rule does not apply even though there was no contemporaneous objection." Id. at 1141. We did not know whether defense counsel had preserved the error, so we gave him the benefit of the doubt on appeal. Here, in sharp contrast, we know why the defendant and her counsel were absent and we know with certainty that Garcia failed to timely object to the errors notwithstanding having been given every opportunity to do so. Garcia and her counsel were absent for only a few minutes during the government's case-in-chief, and her counsel in fact returned to the courtroom at some point during the government's direct examination and while Garcia was still absent. Yet the record shows that no objection was made at any point during Arevalo's testimony, either upon defense counsel's return or Garcia's appearance.

What's more, and far more significant, at the start of the next trial day the government requested a sidebar to discuss the error. During the colloquy the government reviewed in detail what had happened. The prosecutor explained that the court had resumed on time after the Friday lunch break, but that the defendant and her lawyer were not there because they were caught up in a big crowd at the security station in the courthouse. The prosecutor suggested the court read back the

testimony that had occurred in their absence so counsel could consider the evidence and "state her position" before the United States rested its case-in-chief. Notably, the defendant did not join the request and the district court observed that defense counsel could order the transcript if she wanted to. In fact, this was the second time during the trial that the defendant and her counsel were absent after a lunch break when court was scheduled to resume. The first time they notified the court before trial resumed. This time they did not.

After suggesting that the defendant had voluntarily absented herself this time, the court, "out of an abundance of caution," invited the defendant's lawyer to "order the transcript and review it," and welcomed the exploration of any "issue" of concern. Finally, the prosecutor bluntly asked defense counsel: "You are not going to state an objection at this point?" Defense counsel replied: "Not at this time, no." At no point during this extended sidebar (or, in fact, at any time during the balance of the trial) did defense counsel offer any objection, flag any issue, or ask the trial court for any remedial relief. The record could not be clearer that counsel deliberately chose to say nothing and raise no objection.

To be sure, following her conviction, Garcia moved for a new trial on these grounds. Yet that was plainly insufficient to preserve her objection. First, Fed. R. Crim. P. 51(b) unambiguously requires parties to object "when the court ruling or order is made or sought" in order to properly preserve claims of error.

23

Furthermore, the motion came too late to allow the district court to correct the error and avert an "unnecessary retrial." Rodriguez, 627 F.3d at 1379; see also United States v. Nixon, 918 F.2d 895, 904–05 (11th Cir. 1990) (defendant's postconviction motion for mistrial did not suffice to preserve a claim of error, rendering plain error review applicable on appeal).

Had Garcia objected promptly, she would have afforded the trial court an opportunity to remediate or cure the errors. Thus, for example, if asked, the district court may have ordered the government to redo the missed portion of Arevalo's direct examination in the presence of the defendant and her counsel. Or, if requested by counsel, the district court may have had the offending testimony re-read. Or, perhaps, the district court may have struck from the record the missing testimony, and instructed the jury to disregard it. Or, finally, defense counsel could have moved for a mistrial. Instead, counsel sat on her hands and said nothing, and in the absence of any objections the district court had less reason to act.

Garcia's conscious failure to object must mean, if anything, that the error was unpreserved, and, therefore, should be reviewed only for plain error. The contemporaneous objection rule was designed for precisely this kind of problem. The trial of human beings by human beings is necessarily imperfect. Mistakes are made. A prompt objection could have ameliorated or solved the problem.

24

Accordingly, the assumption in Roy that the proper standard of review should be harmlessness beyond a reasonable doubt is unwarranted on the facts here.[3]

## C.

Despite palpable constitutional errors, Garcia's substantial rights were unaffected and she has failed to carry her burden on plain error review.

As for Count Two, the evidence elicited in the absence of Garcia and her counsel is largely irrelevant. Count Two charged Garcia with filing a false Form 1040 personal income tax return for 1997. To prove the charge, the government introduced a copy of a 1997 tax return, signed by Garcia, that reported $0.00 in adjusted gross income; monthly financial reports signed and filed by Garcia under penalty of perjury in bankruptcy court dating back to 1997 and showing that she and her husband actually drew an income of nearly $90,000 for a six month period

---

[3] The concurring opinion suggests that, under Roy, in order to determine whether plain error review applies, we are required to consider not only whether defense counsel had a real opportunity to object and did not do so, but also the reasons for her absence from trial and whether her absence went unnoticed by the Government or the district court. But it is firmly established that the Court applies plain error review "[w]hen a defendant . . . fails to object" once the opportunity arises, regardless of why the unpreserved error was committed or whether the Government or the district court were aware of it. United States v. Monroe, 353 F.3d 1346, 1349 (11th Cir. 2003); see also Fed. R. Crim. P. 51(b) ("If a party does not have an opportunity to object to a ruling or order, the absence of an objection does not later prejudice that party."). Nothing in Roy remotely suggests that the plain error doctrine found in Fed.R.Crim. P. 51(b), explained by the Supreme Court in Olano and amplified by our Court in Rodriguez, would not apply where a defendant failed to object after having been given every opportunity to do so. Nor is there anything in Roy that purported to limit the application of Fed. R. Crim. 51(b). Rather, Roy applied harmless error review because, among other things, the record was unclear as to whether defense counsel objected or had the opportunity to object. Roy, 855 F.3d at 1141. Here, where the record is unequivocal that Garcia did not object when she could have, indeed, when she was expressly invited to do so, plain error review applies.

in 1997; and copies of transcripts from a creditors' meeting in 1998 revealing that Garcia, rather than her husband, answered most of the questions asked by their creditors. Further bolstering the inference that Garcia was deeply involved in her family's finances, and, therefore, was fully aware that the income reported on her 1997 tax return was false, the government presented the testimony of Lynn Gelman, Garcia's bankruptcy attorney. Gelman offered that she told Garcia at the time of the bankruptcy that bankruptcy filings were made under penalty of perjury, and that she went over the various financial forms with Garcia in detail. Notably, the strength of this evidence is entirely unaffected by the missed testimony, which, again, only summarized expenditures made and checks signed in taxable years 2006 and 2007. As a result, there was no obvious prejudice on Count Two arising from their absence.

However, Counts One, Three, and Four present closer questions. As we have explained, these counts charged Lourdes Margarita Garcia first with conspiring from 1997 through mid-September 2008, with Angel Garcia and others, to defraud the IRS in the assessment and collection of taxes, and to commit offenses against the United States, in violation of 26 U.S.C. § 7206(1) by making false income tax returns in 1997 and continuing through mid-September 2008, all in violation of 18 U.S.C. § 371 (Count One). Garcia was also charged substantively with filing false tax returns for taxable years 2006 (Count Three) and 2007 (Count Four).

26

Because the missed testimony was important both in helping to establish the falsity of the 2006 and 2007 returns, and in showing that Garcia was intimately involved in the finances of her family and her business, and therefore was a knowing participant in the conspiracy, it is surely possible that the errors exerted some influence over the jury's deliberations on these counts. Nonetheless, a number of powerful considerations militate against finding prejudice under plain error review.

First, Revenue Agent Arevalo's testimony, while arguably important, was not especially pertinent to the key issue disputed at trial -- namely whether Garcia possessed the requisite mens rea. In addition, the missed testimony was in many ways cumulative of evidence that had been introduced earlier and in their presence. Moreover, even leaving aside Arevalo's testimony, the government's case against Garcia was strong. Furthermore, although absent for a short period of Arevalo's testimony, Garcia's lawyer had ample opportunity to engage in an extensive cross-examination of the government's final witness. Finally, just like in Roy, the absence of Garcia and her lawyer was brief, here amounting to only three tenths of one percent of the entire trial.

As for the first point, although the missed testimony was important since it helped show that Garcia had realized substantial unreported income in 2006 and 2007, and she was fully aware Global had generated the income, its significance

27

was diminished because neither of these facts were actively contested at trial. As Garcia's counsel acknowledged in closing argument, Garcia did not deny or in any way contest that Global had made money (in fact lots of money); that she knew it made money; and that taxes were owed to the IRS. Indeed, Garcia's lawyer asked her point blank at trial, "Do you agree, after seeing all the evidence in this case, do agree that there are taxes that are owed?" To this Garcia simply responded, "Yes." Rather, the only element of the charged crimes challenged was whether Garcia knowingly, willfully and intentionally assisted in the preparation of false tax returns. Garcia and her children testified that Garcia's husband (Angel) handled all financial matters for the family, including filing their taxes, and that Garcia took no responsibility for any of these financial matters. Quite simply Garcia's defense rested entirely on her claim that she was ignorant of her husband's scheme to file false tax returns and that at no point did she knowingly assist him in that unlawful undertaking.

Garcia even admitted to signing some of the false returns at trial. In particular, she admitted to signing a 2006 return that falsely reported $17,858 in adjusted gross income, and the return for tax year 2007 that falsely reported $29,110 in adjusted gross income and which formed the basis of the charge in Count Four. Far from denying that the returns were false or that she had signed some of them, Garcia's defense was simply that neither her accountant, Joseph

28

Villate, nor her husband had ever explained to her what she was signing; that she did not review the returns on her own; and that she was therefore unaware of what she was signing. What's more, far from contesting the ten specific expenditures highlighted from Exhibit 6, Garcia introduced evidence of some of the very same expenditures herself earlier in the trial. In particular, during her cross-examination of IRS Special Agent McNeal, Garcia's lawyer introduced exhibits containing four of the same transactions that were listed in Government Exhibit 6.

A review of the evidence offered, and the arguments Garcia's counsel mounted, establishes that the missing testimony was not the fulcrum on which the jury's deliberations likely turned. To the extent that Arevalo's testimony during the defense team's absence helped make these points, it was undisputed.

In the second place, the claim of prejudice is undermined because the missed testimony was in many ways cumulative. For one thing, Government Exhibit 6 had already been admitted without objection before the lunch recess. Furthermore, Arevalo also explained, before the lunch break, what was in Exhibit 6, how she compiled it, and, most importantly, what its ultimate relevance was. In particular, Arevalo said that the exhibit was created in order to establish how corporate income generated by Global was disposed of by Lourdes Margarita Garcia for personal purposes. Arevalo also explained that the expenditures listed in the schedule were generated from an analysis of checks either written by Garcia or for

29

her benefit, as well as debit transactions that were drawn on Global's accounts. Moreover, Arevalo also told the jury that the expenditures for 2006 added up to $1,039,668.69, an amount far in excess of the $19,980 reported on Garcia's 2006 personal income tax return.

It is, therefore, apparent that most of Arevalo's testimony about Exhibit 6 was revealed to the jury in the presence of the defendant and her counsel. That's not to say the missed testimony was unimportant. Indeed, the six pages of offending testimony undoubtedly helped the jury better understand the exhibit by breaking it down into a few specific and readily understandable items. But the point remains that many of the most important pieces of testimony relating to Exhibit 6 were presented before the lunch recess. This further diminished the claimed prejudice.

Moreover, to the extent Arevalo's testimony crystallized how Garcia spent large chunks of unreported income, any prejudice was reduced still further because Arevalo offered similar testimony in their presence. Thus, for example, for tax year 2005 Arevalo told the jury that many expenditures were made by or for the benefit of Garcia for such personal items as expenses incurred at Burger King, Holiday Video, Cracker Barrel, Walgreens, Exxon, Imperial Bakery, and at an animal clinic. Some of the examples of personal expenditures drawn in 2005, such as payments to Macy's and for her mortgage, were virtually identical to examples

30

highlighted during their absence. Arevalo offered similar examples for 2004 as well, observing that Global's bank accounts were used to pay for expenses incurred at Los Ranchos Restaurant, Macy's, Walgreens, Federal Express, Toys "R" Us, and Quesada Auto Repair. Not only did Arevalo offer this kind of testimony in their presence, but so did Agent McNeal, who highlighted specific checks written by Garcia and drawn on Global bank accounts that the IRS regarded as being personal in nature.

Some of the ten items were actually discussed at other points in trial. Three of them in particular were highlighted in their presence. Thus, McNeal testified about two of the same checks that Arevalo had discussed during the missed testimony. McNeal identified and testified about checks signed by Garcia in the amounts of $9,310.50 and $9,000 drawn on the Global's bank accounts. These are the same checks that Arevalo would highlight later in their absence. Similarly, Arevalo's testimony highlighting a check made payable to Williamson Cadillac for a Hummer vehicle was also in some ways cumulative of testimony about the Hummer offered throughout the trial.

Perhaps more importantly, Arevalo's lay opinion testimony regarding the signature on one of the checks she highlighted in the absence of the defendant and her counsel also was largely cumulative. Arevalo's view that Garcia had signed some of the checks drawn on the Global accounts was important since it helped

31

establish that Garcia was not as ignorant about financial matters as she had claimed; and, indeed, that she was intimately involved in managing money flowing into and out of the corporation. The issue was contested at trial since Garcia denied writing many of the checks attributed to her, including at least one that Arevalo highlighted in their absence. While the testimony about Garcia's signature was important, extensive testimony about Garcia's signatures was adduced earlier in the trial. Thus, by way of example, McNeal offered extensive lay opinion testimony about Garcia's signatures highlighting check after check drawn on the Global accounts and purportedly signed by Garcia. McNeal also identified the signatures on some of the false tax returns as being Garcia's. Similarly, Arevalo offered extensive testimony before the lunch break identifying the defendant's signatures on various checks.

Beyond all of that, the trial errors did not affect the defendant's substantial rights because in many ways the government's case was strong. For starters, the government proved that Garcia's business, Global Medical Group, had received substantial income that flowed through its bank accounts. And the government introduced Global's tax returns in order to show that the business failed to report most of this income.

The government also sought to prove that Garcia was financially sophisticated and aware of the substantial income generated by Global, by offering

32

a body of evidence showing Garcia's intimate involvement in the business. Thus on Global's 2006 and 2007 tax returns, Garcia was listed as the "Tax Matters Partner" and as 100 percent owner of the business. Garcia also engaged in a variety of business transactions on behalf of Global, including negotiating a lease. Moreoever, testimony taken from a physician who sometimes assisted Garcia with her medical practice also revealed that Garcia handled the billing of Global's patients and the submission of insurance payments to Global. And when Global hired a new doctor to serve as a supervisor at a new clinic, Garcia personally handled the doctor's compensation. Testimony from one of Global's patients also revealed Garcia's intimate involvement in Global's billing practices, and testimony from another of Garcia's business associates suggested that Garcia received invoices showing large sums of money paid to Global.

That much of this income should have been, but was not declared as personal income was established beyond any reasonable doubt. Thus, as we already noted, the Garcias' 2006 return reported only $19,980 in income, while Arevalo testified, and Government Exhibit 4 helped establish that the Garcias had a taxable personal income of $403,309, and a tax due of $114,332 for that calendar year. Similarly, Garcia's 2007 tax return reported only $29,111 in personal income, while the amount of taxable income for 2007 was actually $452,779 with an additional tax due of $130,679

33

Finally, the jury got to consider the testimony of the defendant who vigorously denied knowingly defrauding the United States. A defendant's testimony is substantive evidence that a jury may -- and indeed in this case did consider and reject. United States v. Brown, 53 F.3d 312, 314 (11th Cir. 1995) ("[A] statement by a defendant, if disbelieved by the jury, may be considered as substantive evidence of the defendant's guilt."). As the Supreme Court has explained, a defendant who chooses to take the stand runs "the risk that in so doing he will bolster the Government case enough for it to support a verdict of guilty." McGautha v. California, 402 U.S. 183, 215 (1971), reh'g denied by McGautha v. California, 406 U.S. 978 (1972), and vacated in part on other grounds sub nom. Crampton v. Ohio, 408 U.S. 941 (1972). An explanation or denial offered by a defendant at trial that the jury finds implausible or false may "form a sufficient basis to allow the jury to find that the defendant had the requisite guilty knowledge." United States v. Eley, 723 F.2d 1522, 1525 (11th Cir. 1984). Garcia's decision to testify at trial thus, ironically, added further weight to the prosecution's case.

This corpus of evidence, when considered in concert, reveals that there were large sums of money pouring into the Global bank accounts that went unreported on the Global returns; that Garcia was aware of the money being earned by Global; that she used much of the money for her own personal expenditures; and that she

34

did not report any of this as personal income on her tax returns. The inference that Garcia knowingly filed fraudulent tax returns for tax years 2006 and 2007 is clear. Even more importantly, the vast majority of the evidence supporting these conclusions had little to do with the testimony Arevalo offered in their absence. The missing testimony had nothing to do with showing that Global generated large amounts of unreported income. And it had less to do with showing that Garcia was likely aware that the returns she signed were false. The sums represented by the ten items highlighted in the missed testimony were a smaller part of the unreported income established at trial. To the extent the missed testimony helped establish that Garcia knew full well what she was doing when she signed the false returns, it was a smaller part of a much larger fabric supporting the jury's inferences about Garcia's state of mind.

We add, defense counsel extensively cross-examined Arevalo about the information contained in Exhibit 6. Indeed, the cross-examination of Arevalo ran some 45 pages in the trial transcript. Moreover, during the course of that cross-examination defense counsel challenged Arevalo on, among other things, whether specific checks included in the exhibit's schedule were actually signed by Garcia or connected to her in any way. She also vigorously cross-examined Arevalo about one of the specific items discussed in the missed testimony, challenging whether it

35

was accurate to classify the Hummer as a personal expenditure. This too weighs against a finding of prejudice.

We are convinced that Garcia has not satisfied the third prong of plain error review. The cumulative nature of the missed testimony, the strength of the government's overall case, the fact that the missed testimony did not relate to the issue most hotly disputed at trial, the brevity of the missed testimony, and the robust cross-examination of Arevalo strongly indicate that Garcia's substantial rights were unaffected by the errors. Demonstrating a reasonable probability that, but for the error, the outcome would have been different is a heavy burden; Garcia has failed to carry it on appeal.

### D.

This assessment should not be taken to mean that the question of prejudice is an easy one. None of the plain error analysis means that the government has established harmlessness beyond a reasonable doubt. There are, after all, a number of important considerations on the other side of the ledger.

We begin with the nature of the standard itself. The barrier set up by Chapman -- that an error is reversible unless we are satisfied beyond a reasonable doubt that it did not influence the jury -- is formidable. O'Neal v. McAninch, 513 U.S. 432, 438 (1995). As we have explained many times, "beyond a reasonable doubt" is an exacting measure of certitude, requiring "proof of such a convincing

36

character that [a person] would be willing to rely and act upon it without hesitation in the most important of [his] own affairs." United States v. James, 642 F.3d 1333, 1336 (11th Cir. 2011). For this reason, the Chapman standard is the most difficult standard of harmlessness that the government can be required to satisfy. See Dominguez Benitez, 542 U.S. at 86-87 (Scalia, J., concurring); see also United States v. Lane, 474 U.S. 438, 460–61 (1986) ("Thus, the test for harmless constitutional error is stricter than its statutory counterpart."). To carry its burden, the government must show that there is no "reasonable possibility that the [error] complained of might have contributed to the conviction." Lamarca v. Sec'y, Dep't of Corr., 568 F.3d 929, 943 (11th Cir. 2009). Notably, unlike plain error, this standard does not focus on whether, but-for the error, the outcome would have been different. Van Arsdall, 475 U.S. at 680; see also United States v. Guzman, 167 F.3d 1350, 1353 (11th Cir. 1999) (explaining that, unlike other forms of prejudice analysis, Chapman does not require a showing of "actual prejudice"). Rather, it asks only "if there is any reasonable likelihood that the [error] could have affected the judgment of the jury." United States v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995); see also United States v. Rivera Pedin, 861 F.2d 1522, 1529 n. 13 (11th Cir. 1988); Ventura v. Att'y Gen., Fla., 419 F.3d 1269, 1279 n. 4 (11th Cir. 2005); Carr v. Schofield, 364 F.3d 1246, 1255 (11th Cir. 2004). Unless we are satisfied, beyond a reasonable doubt, that the error was "so unimportant and

37

insignificant that [it] may, consistent with the Federal Constitution, be deemed harmless," we may not affirm. Chapman, 386 U.S. at 22.

When measured against this taxing standard, it is notable that, unlike in Roy, the missed testimony here was the final piece of testimony offered from the government's last witness in a long and complex tax fraud trial. Moreover, the witness was summarizing and explicating a dense government exhibit that showed some 400 personal expenditures made by Garcia or for her benefit drawn on the corporate bank accounts. Arevalo's summary testimony about ten personal expenditures that were otherwise deeply embedded in a lengthy exhibit that ran 14 pages long obviously served some significant purposes. For one, as we've already observed, the testimony helped the jury understand a complicated exhibit by breaking it down into illustrative components. Arevalo's testimony also arguably helped crystallize for the jury the criminality of Garcia's conduct by offering concrete examples (amounting to almost $138,000) about how Garcia spent her unreported income.

Moreover, the testimony helped establish Garcia's knowing and willful participation in both the conspiracy and in two of the substantive false filing counts because it revealed her intricate involvement with Global's bank accounts, including evidence that she herself had written some of the checks (and large ones at that) drawn on the corporate accounts. Arevalo's testimony, like Exhibit 6,

38

helped establish that the income reported on Garcia's personal 2006 and 2007 income tax returns was substantially lower than Garcia's actual income, and thus that the returns were false. The testimony served as the final, climactic moment of the government's presentation, which also suggests it may have had an impact on the jury. Indeed it should come as no surprise that the United States offered this summary testimony at the very end of its last witness's testimony. In short, while the missing testimony was brief in relation to the whole, it was consequential and arguably exerted an influence over the trial.

In addition, the errors Garcia sustained are different in some ways from the error the defendant sustained in Roy. Here, both the defendant and her lawyer were absent and the evidence was not re-presented by the government. With the defendant gone, her counsel was deprived of any aid the defendant might have offered in assessing and responding to Arevalo's testimony. Thus, had she been present, Garcia might well have told her lawyer that the signature Arevalo identified as being Garcia's was not in fact her own. See Snyder v. Massachusetts, 291 U.S. 97, 106 (1934), overruled on other grounds by Malloy v. Hogan, 378 U.S. 1 (1964) ("[D]efense may be made easier if the accused is permitted to be present at the examination of jurors or the summing up of counsel, for it will be in his power, if present, to give advice or suggestion or even to supersede his lawyers altogether and conduct the trial himself.").

Also unlike in Roy, the missed testimony here was never reprised in the defense team's presence. This may have hampered defense counsel's cross-examination of Arevalo and impaired her ability to decide whether Garcia should have taken the stand. As for the first point, the Supreme Court "has emphasized that a primary interest secured by the Confrontation Clause is the right of cross-examination." Kentucky v. Stincer, 482 U.S. 730, 736 (1987) (quotation omitted and alteration adopted). What's more, the presence of the defendant and her counsel during the direct examination of an adverse witness is part of what makes the right to face-to-face confrontation an essential guarantor of effective cross-examination. See United States v. Novaton, 271 F.3d 968, 997 (11th Cir. 2001); see also Stincer, 482 U.S. at 745 ("[D]ue process clearly requires that a defendant be allowed to be present to the extent that a fair and just hearing would be thwarted by his absence.") (quotation omitted). Without being present during a witness's direct examination, the defense team has no way of knowing what they can and should challenge the witness on during cross-examination. See United States v. Jeri, 869 F.3d 1247, 1262 (11th Cir. 2017) ("Cross- examination should not go beyond the subject matter of the direct examination and matters affecting the witness's credibility.").

Additionally, the decision by a criminal defendant to take the stand is fraught with danger and is always a difficult one to make. As the Supreme Court

40

has observed, the determination "carries with it serious risks of impeachment and cross-examination." Brooks v. Tennessee, 406 U.S. 605, 609 (1972). Because the decision carries palpable risks, a defendant should not be required to make it "until upon a full survey of all the case as developed by the state, and met by witnesses on his own behalf[,] [h]e may intelligently weigh the advantages and disadvantages of his situation, and, thus advised, determine how to act." Id. at 608 (quoting Bell v. State, 66 Miss. 192, 5 So. 389, 389 (1889)). Here, Garcia's decision to take the stand was made without the benefit of knowing all of the evidence the prosecution had put on in the final, climactic moments of the case.

We offer no conclusion one way or another on harmless error. It is enough to observe for our purposes that the question of prejudice is a closer one when measured against the template of harmlessness beyond a reasonable doubt. But in this case, the defendant failed to preserve the error when she had every opportunity to do so. The trial court should have been given the chance to address the errors. In consequence, we only review the matter for plain error.

### III.

Garcia raises three additional challenges to her convictions. In particular, she urges that the indictment failed to include all of the necessary elements to charge her with joining in a Klein conspiracy in violation of 18 U.S.C. § 371. She also takes issue with a number of the district court's jury instructions, and invokes the

41

cumulative error doctrine to argue that the sum of the district court's errors warrants reversal even if each on its own did not prejudice her defense. Because none of these claimed errors were raised or preserved in the district court, we review them for plain error. Measured against this standard Garcia cannot prevail.

## A.

We review the legal sufficiency of an indictment de novo. United States v. Jordan, 582 F.3d 1239, 1245 (11th Cir. 2009) (per curiam). "A criminal conviction will not be upheld if the indictment upon which it is based does not set forth the essential elements of the offense." United States v. Gayle, 967 F.2d 483, 485 (11th Cir. 1992). But "[w]hen the adequacy of an indictment is challenged for the first time on appeal, this Court must find the indictment sufficient unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant is convicted." United States v. Adams, 83 F.3d 1371, 1375 (11th Cir. 1996). As with the other claimed errors in this case, Garcia did not challenge the indictment in district court.

Garcia says that the indictment failed to allege the essential elements of a Klein conspiracy under 18 U.S.C. § 371, which forms part of the conspiracy charge in Count One. To convict someone of conspiring to defraud the IRS in violation of § 371, the government must prove "(1) [the defendant and at least one other person] agreed to impede the functions of the IRS; (2) [the defendant] knowingly

and voluntarily participated in that agreement; and (3) [one of the conspirators] committed an act in furtherance of the agreement." United States v. Hough, 803 F.3d 1181, 1187 (11th Cir. 2015). Garcia urges that the indictment was insufficient because it failed to include language drawn from Hammerschmidt v. United States, 265 U.S. 182 (1924), which holds that to be convicted of a Klein conspiracy the defendant must have conspired to obstruct or impede a government function "by deceit, craft or trickery, or at least by means that are dishonest." Id. at 188.

Her argument is without merit. To be sufficient, an indictment does not have to track the precise language of a judicial opinion. See United States v. Fern, 155 F.3d 1318, 1325 (11th Cir. 1998). A fair reading of the charges levelled against Garcia shows that all of the elements of the conspiracy were properly alleged. In fact, Count One specifically alleged that one purpose of this conspiracy was "to defraud the United States by impairing, obstructing, and defeating the lawful functions of the Internal Revenue Service." Moreover, Count One clearly detailed the deceitful and dishonest "manner and means" by which the conspirators attempted to accomplish the alleged purpose of the conspiracy. The heart of her argument seems to be that the indictment was defective because it detailed the dishonest means in thirteen paragraphs instead of simply alleging that she agreed with the conspirators to mislead through deceitful means. Count One of the indictment was sufficient. We can discern no error, plain or otherwise.

43

B.

Next, Garcia raises various challenges to the district court's jury instructions. All of them were unpreserved, and, therefore, we only review them as well for plain error.

First, both the government and the defendant agree that the district court's charge to the jury constructively amended Count One when the court told the jury that the conspiracy to defraud included "attempting to impair, obstruct and defeat the lawful function of the IRS." See United States v. Keller, 916 F.2d 628, 634 (11th Cir. 1990) ("[A]n amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment."). The inclusion of the attempt language was error and was plain, but Garcia cannot prevail on plain error review because she has failed to show that it affected her substantial rights or that the error affected the fairness, integrity, or public reputation of the judicial proceeding. Despite the erroneous inclusion of a reference to attempt, a review of this record makes it exceedingly unlikely that the jury convicted Garcia of an attempt in Count One.

In the first place, the line in the jury instructions that Garcia takes issue with is the only mention of "attempt" found anywhere in the instructions or, for that matter, in the entire trial. The government did not present or argue its case on an

44

attempt theory; in fact, the prosecutor never even mentioned the word attempt in its closing argument. And the district court never explained the meaning of the word. This strongly suggests that the error had no impact on the jury. Indeed, the jury had no reason to home in on an attempt or to give the word any legal significance. What's more, and perhaps even more important, the jury also convicted Garcia of the three substantive charges found in Counts Two, Three, and Four. Because each of them was included as an object of the conspiracy, Garcia's convictions on these charges also substantially reduces any possibility that the jury found her guilty on an attempt theory. After all, the jury found that Garcia actually filed false and fraudulent personal income tax returns for 1997, and again for calendar years 2006 and 2007. It is, therefore, remote that the verdict rendered on Count One was somehow based on an attempt to defraud rather than on the actual commission of the substantive crimes. This, when taken in concert with the fact that the court never explained what the word attempt meant, the government never argued an attempt theory to the jury, and the entire evidential foundation of the government's case was devoid of any reference to an attempt allow us to say with great confidence that the error did not prejudice Garcia under plain error review, nor did it affect the fairness and integrity of the proceeding. See United States v. Madden, 733 F.3d 1314, 1323 (11th Cir. 2013).

45

Garcia further claims that the district court failed to instruct the jury, among other things, about the Klein conspiracy alleged in Count One. Again we are not persuaded. For starters, the district court gave the general § 371 conspiracy instruction as to Count One.  To the extent the district court erred, the error did not affect Garcia's substantial rights. To determine whether any error affected the defendant's substantial rights, we ask whether "the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error." Neder v. United States, 527 U.S. 1, 17 (1999).

It is abundantly clear that the primary issue contested at trial was whether the defendant knowingly and willfully participated in the tax conspiracy. We repeat that the jury ultimately convicted Garcia on three substantive tax charges, which were included as objects of Count One. Thus Garcia cannot show that any claimed error affected her substantial rights or that it affected the fairness or integrity of the proceeding. This claim fails as well.

Garcia also argues that the district court erred in failing to give a multiple objects/unanimity instruction for the conspiracy charge. Where the charged conspiracy has multiple possible objects, the jury instructions should inform the jury that they must not only be unanimous as to the conspiracy charge, but also as to the objects of the conspiracy. See United States v. Ross, 131 F.3d 970, 989 (11th

46

Cir. 1997) ("The jury was properly instructed that the Government was not required to prove that [the defendants] committed each of the crimes charged as objects of the conspiracy, provided that the jury unanimously agreed on which of the offenses they conspired to commit."). Here, no such instruction was given.

But Garcia cannot prevail on this round either because defense counsel plainly invited the error. "In the Eleventh Circuit, the doctrine of invited error is implicated when a party induces or invites the district court into making an error." United States v. Brannan, 562 F.3d 1300, 1306 (11th Cir. 2009) (quotations omitted). Thus, for example, "[w]hen a party responds to a court's proposed jury instructions with the words 'the instruction is acceptable to us,' such action constitutes invited error." United States v. Silvestri, 409 F.3d 1311, 1337 (11th Cir. 2005). "These words serve to waive a party's right to challenge the accepted instruction on appeal." Id. Here, the district court specifically proposed using a special verdict form to ensure that the jury was unanimous as to each object of the charged conspiracy. Defense counsel objected to the use of a special verdict form. The court responded, "you understand that if I go along with you, that you can't be later heard to complain that the jury didn't specify the manner in which the offense was committed." To this, defense counsel categorically answered, "yes, your honor." The district court heeded counsel's objection, followed her advice, and did not use the special verdict form. Since Garcia's counsel undisputedly "induce[d]"

47

the error, she cannot be heard to complain about it later on appeal. United States v. Stone, 139 F.3d 822, 838 (11th Cir. 1998).

Moreover, even if the invited error doctrine did not foreclose the claim -- and we believe that it does -- Garcia still would not prevail on this issue since the district court never instructed the jury that the government only had to prove one of the objects of the conspiracy as alleged. Rather the court's instructions required the jury to find the defendant guilty of conspiring to impede and impair the IRS in its tax assessing and collecting function and of committing substantive tax offenses against the United States.

Garcia's final two challenges to the court's instruction fail as well because neither of the instructions she takes issue with was erroneous. First, appellant claims that the district court failed to properly instruct the jury on the meaning of the word "material" when it charged the jury about the three substantive false filing counts. "The elements of false filing under § 7206(1) are: (1) the making and subscribing of a tax return containing a written declaration that it was made under the penalties of perjury; (2) by one who did not believe the return to be true and correct as to every material matter; and (3) who acted in a willful, as opposed to a negligent manner." United States v. Kaiser, 893 F.2d 1300, 1305 (11th Cir. 1990). In Neder, the Supreme Court held that "a false statement is material if it has 'a

48

natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" Neder, 527 U.S. at 16.

Here, the district court gave instructions on each of the elements of a § 7206(1) false filing offense, and then offered the jury the following definition of "material": "A false matter is 'material' if the matter was capable of influencing the Internal Revenue Service." The court also properly explained that that "[a] declaration is 'material' if it concerns a matter of significance or importance, not a minor or insignificant or trivial detail." When taken in light of the entire jury charge, these definitions were clearly adequate. See United States v. Gibson, 708 F.3d 1256, 1275 (11th Cir. 2013) ("When the jury instructions, taken together, accurately express the law applicable to the case without confusing or prejudicing the jury, there is no reason for reversal even though isolated clauses may, in fact, be confusing, technically imperfect, or otherwise subject to criticism."). Garcia has not established error, let alone one that was plain, affected her substantial rights, and undermined the fairness and integrity of the judicial proceeding.

Finally, Garcia challenges the district court's aiding and abetting instruction. "To prevail under a theory of aiding and abetting, the government must prove: (1) the substantive offense was committed by someone; (2) the defendant committed an act which contributed to and furthered the offense; and (3) the defendant intended to aid in its commission." United States v. Seabrooks, 839 F.3d 1326,

1333 (11th Cir. 2016). Garcia says that the district court erred in using the Eleventh Circuit's pattern aiding and abetting instruction because it explained that the jury must find that Garcia "intentionally associated" herself with the crime, rather than instructing that she must act, as Garcia contends is required by Rosemond v. United States, 572 U.S. 65 (2014), "with the intent of facilitating the offense's commission." Id. at 71. Again, we are unpersuaded.

The district court's instruction was nearly identical to instructions on aiding and abetting that we have approved in the past. See United States v. Broadwell, 870 F.2d 594, 607 n. 32 (11th Cir. 1989) ("[I]t is necessary that the defendant willfully associate himself in some way with the crime and willfully participate in it."). Moreover, the Supreme Court did not change the law on aiding and abetting in Rosemond -- that decision only clarified what the law had always been. See Rosemond, 572 U.S. at 76. That the district court did not adopt verbatim certain passages from Rosemond does not undercut the correctness of its aiding and abetting instruction. The district court's instructions were altogether consonant with the law on aiding and abetting as we had explicated it before Rosemond, and after.

## C.

Finally, Garcia urges reversal of her convictions on account of cumulative error. "The cumulative error doctrine provides that an aggregation of non-

50

reversible errors (i.e., plain errors failing to necessitate reversal and harmless errors) can yield a denial of the constitutional right to a fair trial, which calls for reversal." United States v. Baker, 432 F.3d 1189, 1223 (11th Cir. 2005) (quotations omitted). "We address claims of cumulative error by first considering the validity of each claim individually, and then examining any errors that we find in the aggregate and in light of the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial." Morris v. Sec'y, Dep't of Corr., 677 F.3d 1117, 1132 (11th Cir. 2012). "The total effect of the errors on the trial will depend, among other things, on the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including the efficacy -- or lack of efficacy -- of any remedial efforts); [ ] the strength of the government's case, and the length of trial." Baker, 432 F.3d at 1223 (quotation omitted).

Even when considered in concert, the errors alleged here -- including the serious matter of introducing inculpatory evidence in the absence of the defendant and her counsel along with the constructive amendment of the indictment, and the failure to instruct the jury on an element of the Klein conspiracy -- do not warrant reversal. To begin with, as we have made abundantly clear, none of the errors, standing alone, affected Garcia's substantial rights. The government presented a very strong case; and the errors were not closely related to the central issue raised

51

during the trial -- whether Garcia acted with the necessary mens rea, that is knowingly, willfully, and intentionally. Moreover, the Fifth and Sixth Amendment errors had precious little to do with the instruction on attempt or the failure to include more particularly one of the Klein conspiracy elements in the charge. None of the errors standing alone or together deprived Garcia of a fair trial.

IV.

We end where we began, by emphasizing that the Fifth and Sixth Amendment errors in this case are troubling. This is particularly true in the face of trial counsel's deliberate failure to object. The failure to do so meant that the district court in this adversarial proceeding had less reason to act. As a result, the trial proceeded without any remedial action to address their absence. There can be little doubt that, if Garcia could show prejudice, this case would qualify as one where the Court should, under the fourth prong of plain error review, find that the errors "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings" and exercise its discretion to afford relief. United States v. Olano, 507 U.S. 725, 732 (1993). The right to counsel, the right to confront one's accusers, and the right to be present at trial are fundamental to our system of justice. See Gideon v. Wainwright, 372 U.S. 335, 344 (1963); Pointer v. Texas, 380 U.S. 400, 404 (1965); United States v. Bowe, 221 F.3d 1183, 1189 (11th Cir. 2000). But at the end of the day when measured against the standard of plain error

we are fully satisfied that the defendant has failed to carry her heavy burden. Further, as for the sufficiency of the indictment, cumulative error, and the district court's jury instructions, we are again fully satisfied that the claimed errors did not prejudice Garcia. Accordingly, we affirm.

**AFFIRMED.**

WILSON, Circuit Judge, concurring:

This troubling case presents a familiar factual scenario—a district court judge permitted a criminal trial to resume, and inculpatory evidence to be taken, without defense counsel present. We recently confronted a nearly identical appeal from the same district judge as an en banc court in *United States v. Roy*. 855 F.3d 1133 (11th Cir. 2017) (en banc). In *Roy*, we determined that such constitutional violations can—and usually will—be harmless. The facts of this case, however, are even more egregious than those in *Roy* because here, the defendant was also absent. Despite the deserted defense table, the district court judge prompted the government to continue its direct examination of an important witness.

I maintain that the deprivation of counsel in *Roy*—like the constitutional violation in the instant case—constituted a structural error, and "[t]he Supreme Court has given explicit instructions for remedying structural error: remand for new, constitutionally-compliant proceedings." *Id.* at 1246 (Wilson, J. dissenting) (citing *United States v. Cronic*, 466 U.S. 648, 659 & n.25, 104 S. Ct. 2039, 2047 & n.25 (1984)). The *Roy* majority, however, decided to review the constitutional violations for harmless error beyond a reasonable doubt.

Recognizing a structural error and remanding *Roy* for constitutionally-compliant proceedings would have prevented this district court judge from continuing his indisputably unconstitutional practice of conducting criminal trials

54

in the absence of defendants or their counsel. Such a decision would have incentivized the judge to forego his unconstitutional courtroom policies; conversely, however, our decision to employ the harmless error analysis effectively sanctioned these policies, as that analysis provides no mechanism for future defendants unlucky enough to sit in this particular judge's courtroom to challenge the constitutional violations that will inevitably continue to occur. Ultimately, our decision in *Roy* confirms what the Supreme Court has consistently held: structural errors "defy analysis by harmless-error standards" because they "affect[] the framework within which the trial proceeds." *Arizona v. Fulminante*, 499 U.S. 279, 280, 309–10, 111 S. Ct. 1246, 1265 (1991).

Nonetheless, we are bound to apply the framework established in *Roy*—harmless error beyond a reasonable doubt. *Roy*, 855 F.3d 1133, 1141 (majority opinion). Despite *Roy*'s mandate, however, the majority chose to review the constitutional violations at issue in this case for plain error. Because both analyses result in an affirmance, I concur.

## I.

A grand jury charged Lourdes Margarita Garcia with (1) conspiring with her husband, Angel, and others (a) to defraud the United States by impeding the IRS and (b) to commit an offense against the United States by making false statements on her tax returns, in violation of 18 U.S.C. § 371 (Count 1); and (2) making false

statements on her 1997, 2006, and 2007 tax returns, in violation of 26 U.S.C. § 7206(1) (Counts 2–4).  Garcia and her husband operated a medical clinic, Global Medical Group (Global), in Miami, Florida.  The Garcias set up Global as a pass-through corporation, taking their income directly from Global's corporate bank accounts.  The indictment alleged that the income Garcia received from Global was significantly greater than the amount she and her husband represented to their accountant and the IRS.

Garcia stood trial in the Southern District of Florida.  The trial lasted ten days and involved dozens of witnesses.  The government called IRS Agent Angela Arevalo as its twenty-third and final witness and, in the presence of the defendant and her attorneys, Arevalo testified at length about Garcia's tax returns for 1997, 2006, and 2007; Global's and the Garcias' income during those years; and how she reviewed the Garcias' accounts to determine what transactions were attributed to personal use.  During this portion of Arevalo's testimony, the government introduced a schedule prepared by Arevalo summarizing the "disposition of proceeds for tax years 2006 and 2007" in order to "demonstrate how the income, coming from Global Medical center[,] was disposed by the defendant" in taxable years 2006 and 2007.  Doc. 77 at 75–76.  Garcia's counsel did not object to the admission of this evidence.

56

As the government prepared to review a few of the transactions, the court ordered a lunch recess.  At the end of this break, courthouse personnel delayed Garcia and both of her attorneys at the security checkpoint, apparently due to a false alarm indicating that Garcia had a cell phone in her possession.  One of Garcia's attorneys, Sabrina Puglisi, proceeded to the courtroom; the other, Ashley Litwin, remained behind with Garcia.  By the time Puglisi reached the courtroom, however, the government had already resumed its direct examination of Agent Arevalo.  Garcia and Litwin arrived approximately two to seven minutes later.  The parties agree that examination occurred without counsel for approximately three minutes and without the defendant for approximately five to ten minutes.[1]

While counsel was absent, three checks from 2006 and three checks and four debit charges from 2007—all of which were contained in the previously-admitted schedule—were published and shown to the jury.  A cross, redirect, and re-cross followed, during which Garcia's counsel questioned Arevalo for about fifty pages of the trial transcript before the government rested its case.

---

[1] The record is not clear as to when each missing individual—Puglisi, Litwin, and Garcia— returned to the courtroom.  The trial transcript shows that the district court announced a one-hour lunch break at 12:30 P.M., and trial resumed at 1:30 P.M.  The government's post-lunch direct examination of Arevalo spans seven transcript pages.  Puglisi was back by at least the seventh page, as the government passed the witness to her for cross-examination without comment at that time.  Because the transcript is not time-stamped, both the government and Garcia assume that counsel was absent during the entire post-lunch direct examination.  For the purpose of this appeal, I do as well.

The transcript does not reveal why the district court judge chose to resume the examination of Arevalo in the absence of both the defendant and her counsel. The judge did not directly comment on the defense's absence; however, when the prosecutor—likely realizing the inappropriateness of the situation—gestured to the empty defense table, the judge simply said "please continue."

Curiously, Garcia never objected to the taking of inculpatory evidence in her absence, despite the government's prompting. During the next trial day, the prosecutor requested a sidebar where he acknowledged that he conducted a portion of Agent Arevalo's direct examination without the defendant or her counsel present, and asked if the court would be willing to read back the missed testimony. The judge responded:

> [Garcia] didn't have to be here if she didn't want to be here. I mean, everybody else seemed to be able to make it on time . . . . If she wants to read it, she can order the transcript and read it. There wasn't anything in there that I can recall, any particular issue. I mean, if you want to order the transcript, you're welcome to.

Doc. 78 at 3–4. The prosecutor pressed on, noting that he wished to ensure that Garcia had a chance to consider any incriminating evidence presented during her absence before the government rested its case. The district court judge continued:

> I mean, I took it as she voluntarily absented herself from the proceedings. One way to look at it. Just out of an abundance of caution, if she thinks there is any kind of

58

> prejudice, she can order the transcript and review it . . . . I mean, it's self-inflicted. She manufactured the problem herself; I don't know how she can fault anybody else for it.

*Id.* at 4–5. In a final attempt, the prosecutor asked defense counsel if she was "going to state an objection at this point," to which she responded: "Not at this time, no." *Id.* at 5. The sidebar concluded, and the trial continued.[2]

After the jury convicted her of all counts, Garcia filed a Motion for New Trial, raising Fifth Amendment, Sixth Amendment, and Federal Rule of Criminal Procedure 43 claims. The district court denied her motion, and Garcia appealed, arguing that she is entitled to a new trial because (1) her constitutional rights were violated by the district court judge's decision to allow the government to introduce inculpatory evidence while she and her counsel were absent, and (2) the indictment was insufficient and the jury instructions were improper.

The majority affirmed the district court's decision on all counts, reviewing the constitutional violations for plain error. I agree that we must affirm. I maintain, however, that our *Roy* decision mandates that we review this constitutional violation for harmless error beyond a reasonable doubt, and that is why I write separately. Because I agree with the majority's reasoning

---

[2] I commend the prosecutor in this case for his candor in persistently drawing the district court's attention to a serious constitutional violation.

regarding Garcia's indictment and jury instruction claims, I do not address them.

## II.

Garcia alleges that several constitutional violations occurred when the district court started trial without her or her counsel, and that each warrants reversal of her conviction. First, she argues that the absence of her counsel violated the Sixth Amendment. Second, she contends that her absence violated the Fifth and Sixth Amendments. Finally, she argues that her absence combined with her counsel's absence amplifies the severity of these violations. Although I agree with Garcia that serious constitutional violations occurred, her arguments for a new trial are ultimately unavailing under the harmless error analysis required by *Roy*.

**A. Absence of Garcia's Counsel**

Garcia argues that the absence of her counsel during the introduction of inculpatory evidence by a key prosecution witness violated her Sixth Amendment right to counsel and, accordingly, requires reversal of her convictions. First, she claims that the violation constituted structural error, necessitating automatic reversal. Second, she argues that it amounted to hybrid error under *Brecht v. Abrahamson*. 507 U.S. 619, 638 n.9, 113 S. Ct. 1710, 1722 n.9 (1993). Finally, she asserts that, in any event, the error was harmful. The majority dismisses each of these arguments, instead reviewing the constitutional violations for plain error.

60

I address each theory—structural error, hybrid error, plain error, and harmless error—respectively.

### i.    There Was No Structural Error

There is no doubt that a startling, intentional depravation of Garcia's Sixth Amendment right to counsel occurred here. Although it is well-established that "a trial is unfair," and prejudice is presumed, "if the accused is denied counsel at a critical stage of his trial," *United States v. Cronic*, 466 U.S. 648, 659, 104 S. Ct. 2039, 2047 (1984), there is no getting around *Roy*. In that case, the same district judge permitted the government to go forward with direct examination in the absence of the defendant's counsel. The prosecution elicited inculpatory testimony for seven minutes before Roy's counsel arrived. *Roy*, 855 F.3d at 1135. After considerable arithmetic and an exhaustive analysis of the meaning of "stage," the en banc court determined that the prosecution's 18 questions on direct examination did not amount to a "critical stage" of Roy's trial under *Cronic*. *Id.* at 1148. The majority specifically found that 18 questions (out of more than 2,500) and 7 minutes (out of 1,884) did not "constitute a separate step in the process of the trial, or a discrete phase of it," such that it could be considered a "stage" of a trial at all. *Id.* at 1140, 1147–48.

If we are faithful to the majority opinion in *Roy*, then it is clear that the absence of Garcia's counsel here did not amount to a structural error under *Cronic*.

Garcia's counsel was absent for a shorter amount of time (3 minutes) in a longer overall trial (2,987 minutes) than Roy's. While "[l]ength alone does not always define a stage of a trial" for *Cronic* purposes, *id.* at 1146, it is clear that this portion of Garcia's trial falls outside of the especially demanding definition of "critical stage" put forth in *Roy*, which would require counsel's absence "throughout an entire discrete, critical stage of a criminal proceeding."[3]  *See id.* at 1164.

Garcia does not fare any better under *Roy*'s "substantial portion determination." *Id.* at 1165. Under this case-by-case analysis, a presumption of prejudice may attach depending upon "the length of time counsel was out, the proportion of the trial missed, [ ] the significance of what [counsel] missed," and "whether the reviewing court can determine when counsel was out and what he missed." *Id.* As noted above, the length of time that Garcia's attorneys were absent (3 minutes) and the proportion of the trial that they missed (.1%) are even less significant than in *Roy*. Furthermore, we know almost precisely which portion of the trial Garcia's counsel missed; her counsel cross-examined the government's

---

[3] Whether this is a fair reading of "critical stage" or a faithful application of *Cronic* has been vigorously debated by the full court. *See, e.g.*, *Roy*, 855 F.3d at 1238–41 (Wilson, J., dissenting) ("I can think of no more critical a stage in criminal proceedings than the admission of inculpatory evidence against a defendant."); *id.* at 1213 (Rosenbaum, J., concurring in part and concurring in the result) (noting that "[t]he Supreme Court has never held that the absence of counsel for part, but not all, of a critical stage of trial does not constitute structural error" and that *Cronic* speaks of the absence of counsel not "throughout" but "*at* a critical stage"). But this test is the one that has been adopted by this Court sitting en banc, and we must respect the prior precedent rule. *See Smith v. GTE Corp.*, 236 F.3d 1292, 1303 (11th Cir. 2001) ("[W]e categorically reject any exception to the prior panel precedent rule based upon a perceived defect in the prior panel's reasoning or analysis as it relates to the law in existence at that time.").

witness extensively; and Garcia's counsel were encouraged to order the transcript and determine whether anything else was objection-worthy, although they declined to do so.  Under *Roy*'s province, there was no structural error, be it *Cronic* or otherwise.

### ii.    Brecht *Hybrid Error Does Not Apply*

Next, Garcia asks us to apply the "hybrid error" exception contemplated in footnote nine of *Brecht v. Abrahamson*, which would require reversal without a showing of actual prejudice.  507 U.S. 619, 638 n.9, 113 S. Ct. 1710, 1722 n.9 (1993).  In *Brecht*, which established the standard for habeas petitioners challenging constitutional trial errors, the Supreme Court noted that an exception may be warranted "in an unusual case" where "a deliberate and especially egregious error of the trial type, or one that is combined with a pattern of prosecutorial misconduct, might so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." *Id*.

The Supreme Court has not applied—or even remarked upon—this exception since, and neither has this Court.  Of the circuits that have discussed the *Brecht* footnote nine exception, all have recognized that it is reserved for especially shocking trial misconduct, those "unclassifiable and pervasive errors" the harmful effects of which cannot be evaluated from the record.  *United States v. Bowen*, 799

F.3d 336, 353 (5th Cir. 2015); *see also Hassine v. Zimmerman*, 160 F.3d 941, 959–61 (3d Cir. 1998).  Instructively, in *Brecht* itself, the Supreme Court found that it was, "of course, [ ] not presented with such a situation" where the government committed numerous *Doyle*[4] violations during cross-examination and closing arguments while prosecuting a defendant for first-degree murder.  *Brecht*, 507 U.S. at 638 n.9, 113 S. Ct. at 1722 n.9.  Ultimately, no authority exists justifying the extension of the *Brecht* exception to the constitutional violation at issue in this appeal.

### iii.    Plain Error Analysis is Improper

The majority reviews the constitutional violation here for plain error, rather than for harmless error beyond a reasonable doubt.  While I maintain that neither analysis should be necessary, as a structural error occurred and "[t]he Supreme Court has given explicit instructions for remedying structural error: remand for new, constitutionally-compliant proceedings," *Roy*, 855 F.3d at 1246 (Wilson, J., dissenting) (citing *Cronic*, 466 U.S. at 659 & n.25, 104 S. Ct. at 2047 & n.25), I recognize that we are bound by the majority's decision in *Roy*.  Accordingly, the proper standard of review is harmless error beyond a reasonable doubt.

---

[4] *Doyle v. Ohio*, 426 U.S. 610, 611, 96 S. Ct. 2240, 2241 (1976) (holding that "use of the defendant's post-arrest silence" "to impeach a defendant's exculpatory story, told for the first time at trial" violates due process).

In deciding to apply the plain error analysis, the majority focuses on the following language in *Roy*:

> Absent any knowledge of why defense counsel was absent, whether the AUSA or judge realized he was not present, about what counsel realized or didn't when he walked in late, and about whether he took some ameliorative action not reflected in the transcript, we will not apply the plain error rule or remand for any findings necessary to decide if it is applicable. Instead, in order to simplify our analysis, we will indulge the assumption that the plain error rule does not apply even though there was no contemporaneous objection.

*Roy*, 855 F.3d at 1141 (majority opinion). The majority interprets this passage to mean that, because "[w]e did not know whether defense counsel had preserved the error, [ ] we gave him the benefit of the doubt on appeal," Maj. Op. at 22, and thus "indulge[d] the assumption that the plain error rule d[id] not apply," *Roy*, 855 F.3d at 1141. In this case, the majority reasons, it is apparent that counsel failed to object, and therefore it is unnecessary to "indulge th[is] assumption"; accordingly, plain error review applies. This is a misinterpretation of *Roy*, as it considers only whether defense counsel took "ameliorative action," and ignores several other factors relied upon by the *Roy* court.

Although the majority is correct in stating that counsel in this case did not object to the constitutional violations, we are still bound to review for harmless error beyond a reasonable doubt because we do have knowledge of (1) why defense counsel was late (she was held up in security), (2) whether the AUSA

65

realized she was not present (he gestured to the defense table, acknowledging that it was empty), and (3) whether the judge realized counsel was not present (he responded to the AUSA's gesture with "please continue"). In *Roy*, we emphasized the importance of the third factor—whether the judge noticed defense counsel was absent. In dismissing the appellant's contention that the district court "allowed" the introduction of inculpatory evidence in the absence of defense counsel, the *Roy* court stated, "[t]here is nothing in the record to indicate . . . that the court did not notice counsel was absent." *Roy*, 855 F.3d at 1141 n.6. In the instant case, it is clear the judge noticed that the defendant and her counsel were absent based on his instruction to the AUSA to "please continue" after the AUSA gestured to the unoccupied defense table. Even without that indication, however, it is illogical to suggest that a judge would not notice a vacant defense table. Regardless of these facts, under *Roy*, "[w]e can indulge the assumption" that the harmless error analysis, as opposed to the plain error analysis, applies "because even with it the result is the same." *Id*.

Moreover, I fear that the majority's decision to review such blatant constitutional violations for plain error sets a dangerous precedent. The harmless error analysis dictated by *Roy* effectively sanctions this district court judge's unconstitutional practice of overseeing criminal trials while defendants and their counsel are absent, as the standard is too burdensome to overcome. Reviewing the

constitutional errors that will inevitably continue to occur in this judge's courtroom for plain error gives future defendants even less opportunity to remedy these constitutional violations.

### iv.    There Was No Harmful Error

Having concluded that structural error, hybrid error, and plain error review do not apply, we are left with *Chapman* harmless error review.  *See Roy*, 855 F.3d at 1178.  Under this standard, we must determine whether the government has "prove[n] beyond a reasonable doubt that the error complained of"—the absence of counsel during three minutes of testimony—"did not contribute to the verdict obtained," but was instead "harmless beyond a reasonable doubt."  *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967).  I address the relevant counts in turn and explain why the government has met its burden with respect to each.[5]

### 1.  The 1997 Substantive Count

Count 2 charged Garcia with making a false statement in her year 1997 tax return, in violation of 26 U.S.C. § 7206(1).  The evidence discussed during counsel's absence was both factually and legally unrelated to Garcia's 1997 tax

---

[5] As noted above, the parties agree that neither defense attorney was present for approximately three minutes of direct examination.  However, because the transcript does not contain timestamps, I proceed, out of an abundance of caution, with the assumption that counsel was absent from the end of the lunch break to the beginning of cross examination—the first time that defense counsel's name appears on the transcript.  This spans seven pages.  *See* Doc. 77 at 79–85.

returns, business income, or spending.  Therefore, the error was harmless beyond a reasonable doubt as to Count 2.

## 2.  The 2006 and 2007 Substantive Counts

Counts 3 and 4 charged Garcia with making a false statement on her 2006 and 2007 tax returns, in violation of 26 U.S.C. § 7206(1).  Beyond a reasonable doubt, Garcia's convictions for Counts 3 and 4 were not affected by the three minutes of testimony missed by her counsel.  Over six days and through the testimony of twenty-three witnesses, the government introduced overwhelming evidence that Garcia made false statements on her 2006 and 2007 joint tax returns by misrepresenting her gross income.  It did so through technical tax and accounting presentations and through a wide variety of witnesses who testified to the Garcias' extraordinary spending in 2006 and 2007.  Furthermore, everything discussed during the three minutes counsel was absent had already been admitted into evidence without objection.  Moreover, Garcia's counsel proceeded to conduct an extensive cross-examination and then declined to order the record, to make any objections, or to conduct further inquiry into the missed testimony.  We are satisfied beyond a reasonable doubt that Garcia's three-minute deprivation of counsel was harmless as to Counts 3 and 4.

IRS Agents Reid, McNeal, and Arevalo testified at length concerning the Garcias' business structure, bank accounts, tax returns, and spending.  The

68

government also called the Garcias' certified public accountant (CPA) as a witness; he testified that the Garcias hid five bank accounts from him, instructed him to designate a large portion of Global's income as "shareholder loans," and had him divide up small percentages of the rest of the income between the family. IRS Agent Edwina McNeal prepared a schedule of personal expenditures and identified over $180,000 in checks that were signed by Garcia and withdrawn from Global accounts, but not reported to her accountant in 2006 and 2007. Additionally, Arevalo testified (with counsel present) that Global had no shareholder loans, that it earned considerably more than what Garcia reported, and that it passed through over $400,000 in taxable income to the Garcias in both 2006 and 2007.

Patients, accountants, salespersons, IRS agents, and a real estate attorney testified about the Garcias' significant personal spending in 2006 and 2007, including the purchase of multiple luxury cars and a $2 million home. Agent McNeal identified $440,000 in checks that Garcia endorsed to Angel in 2006, which Garcia admitted were for the home's down payment. The CPA who assisted with the purchase of the home testified that the Garcias gave him copies of fictitious joint tax returns for 2004 through 2006 reflecting substantial gross income (almost $1 million per year) in order to obtain a self-employment verification letter for the purchase of the home. Moreover, Agents Reid and

69

McNeal also reviewed $100,000 in checks that Garcia wrote for the installation of a custom kitchen in the newly purchased home.  This is just a snapshot of the evidence the government introduced demonstrating that the Garcias' income was substantially higher than the reported amounts.  Notably, all of this evidence was presented in the presence of defense counsel.

The government also presented overwhelming evidence connecting Garcia to the false tax returns and exorbitant spending at issue.  IRS Agents Reid, McNeal, and Arevalo testified repeatedly as to the unique characteristics of Garcia's signature, which they identified on multiple documents and checks.  Their testimony was supported by other witnesses, such as salesman Charles Fortin, who identified Garcia as the person who signed "Lourdes Garcia" on a $50,000 check drawn on her children's account in 2007.

Arevalo served as the government's twenty-third witness, summarizing much of the previously-admitted evidence.  Prior to the lunch break on the sixth day of trial, Arevalo explained in great detail how she examined checks and debit receipts in order to compute how much of Global's funds the Garcias used on personal expenses benefiting their family, and how she compiled this information into a schedule, which was admitted into evidence without objection.  Arevalo's testimony amounted to 130 pages of trial transcript with counsel present.  The

70

three minutes of her testimony missed by Garcia's counsel was a fraction of the hours of direct examination, cross examination, redirect, and recross.

In light of the overwhelming evidence against Garcia, it is clear beyond a reasonable doubt that this three-minute portion of Arevalo's testimony did not contribute in any significant way to the verdicts as to Counts 3 and 4. Our conclusion is bolstered by the fact that all of the evidence discussed during those three minutes had already been admitted into evidence without objection. Furthermore, Garcia's counsel cross examined Arevalo for fifty pages of trial transcript regarding the accounts, checks, and transactions listed in Arevalo's schedule. And after the cross, Arevalo repeated on redirect the details of numerous specific checks, how she identified Garcia's signature, how she computed Global's income, and how she attributed specific items to calculate the Garcias' actual income. The error was harmless beyond a reasonable doubt as to Counts 3 and 4.

### 3. The Conspiracy Count

Finally, the missed testimony was harmless as to the Count 1 conspiracy conviction. Count 1 charged Garcia with conspiring with her husband and others to defraud the United States by making a false statement on her federal income taxes, in violation of 18 U.S.C. § 371. None of the evidence presented during counsel's absence related to the conspiracy elements of Count 1, and the government put forth overwhelming independent evidence of an overt act toward

71

the falsification of tax returns.  Indeed, the jury convicted Garcia of personally

committing such an act in Counts 2 through 4, which, as discussed above, were not

affected by the constitutional error.  The Sixth Amendment error did not contribute

to the Count 1 conspiracy verdict, and it was therefore harmless beyond a

reasonable doubt.

    *v.*    *Summary*

Applying the framework established in *Roy*, the three-minute absence of

Garcia's counsel, although a constitutional violation, was harmless beyond a

reasonable doubt as to all counts.  I now turn to the absence of Garcia herself.

## B. Absence of Garcia

Next, Garcia argues that her five-to-ten minute absence from trial constitutes

a separate ground for reversal.  I agree that proceeding with Arevalo's direct

examination without Garcia present violated her constitutional rights; however,

applying the same harmlessness analysis as above, we must affirm.

A defendant's right to be present at trial is grounded in the Sixth

Amendment's Confrontation Clause, the Fifth Amendment's Due Process Clause,

and Federal Rule of Criminal Procedure 43.  *See United States v. Novaton*, 271

F.3d 968, 997 (11th Cir. 2001).  The Confrontation Clause provides the narrowest

right, primarily protecting the right of cross-examination, *id.*, while the Due

Process Clause grants a somewhat broader guarantee of presence at any critical

stage if that presence "would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 2667 (1987). Rule 43, on its face, provides the broadest right for a defendant to be present. *See* FED. R. CRIM. P. 43(a) ("[T]he defendant must be present at . . . every trial stage . . . ."); *see also Novaton*, 271 F.3d at 998.

We generally apply the harmless error test to determine whether the absence of a defendant from a portion of a trial warrants reversal. *Novaton*, 271 F.3d at 998–99 ("[C]ourts have repeatedly held that the continuation of trial in absence of a defendant may be harmless."); *see also Arizona v. Fulminante*, 499 U.S. 279, 306–07, 111 S. Ct. 1246, 1263 (1991); *Roy*, 855 F.3d at 1141–43. While counsel's simultaneous presence or absence is one relevant factor to be considered in determining whether a defendant's absence was harmless, it is not dispositive. *See Novaton*, 271 F.3d at 1000.

Here, as discussed in detail above, any deprivation of Garcia's constitutional right to be present during Arevalo's testimony was harmless. Garcia missed five to ten minutes—about seven pages of trial transcript—of a direct examination of the government's twenty-third witness that lasted for multiple hours and 130 pages of the trial transcript. The direct examination clearly had no impact on Counts 1 or 2, which stood independently of Arevalo's testimony. As to Counts 3 and 4, the government had already presented overwhelming evidence that Garcia knowingly

73

made false statements on her 2006 and 2007 tax returns, and all of the evidence discussed by Arevalo had been admitted without objection while she and her counsel were present. Garcia was absent for five to ten minutes of a 2,987 minute trial. Although we have previously found harmful error when a defendant was absent for three full *days* of trial, *see Novaton*, 271 F.3d at 996–1000, when a defendant "has been absent for only a brief or minor portion," we have generally found her absence to be harmless. *See United States v. Durham*, 287 F.3d 1297, 1309 (11th Cir. 2002) (collecting cases). Garcia's absence was brief, minor, and, I conclude, harmless.

## C. Simultaneous Absence of Garcia and Her Counsel

Garcia's third claim is that her absence from trial, combined with the absence of her defense attorney, constitutes reversible error. But we have already found beyond a reasonable doubt that the three minutes of testimony missed by both Garcia and her counsel did not contribute to the verdict. Thus, Garcia's arguments only gain traction if we apply a test other than harmless error. Under *Roy* and *Fulminante*, however, we are required to apply the harmless error test to the constitutional violations alleged here. That test, as we have already shown, yields no relief for Garcia.

For the foregoing reasons, I think the majority erred in reviewing the constitutional violations for plain error. Although it is my belief that similar

74

constitutional violations will continue to occur in this district court judge's courtroom until this Court recognizes the violations as structural errors, and remands for new, constitutionally-compliant proceedings, I recognize that we are bound by *Roy*.  Under *Roy*, harmless error beyond a reasonable doubt is the appropriate standard.  Accordingly, Garcia is not entitled to relief.