[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-11330
Non-Argument Calendar
_____

D.C. Docket No. 8:16-cr-00524-SDM-CPT-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JAMES J. JEAN-RENE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(September 24, 2019)

Before WILLIAM PRYOR, MARTIN and BRANCH, Circuit Judges.

PER CURIAM:

James Jean-Rene appeals his convictions and sentence of 88 months of imprisonment for one count of conspiring to convert property of the United States and to commit aggravated identity theft, 18 U.S.C. § 371, seven counts of unlawfully converting government property, *id.* §§ 641, 2, and seven counts of aggravated identity theft, *id.* §§ 1028A, 2. Jean-Rene bought 108 Treasury checks worth $850,174.92 that were either issued as refunds for fraudulent tax returns or stolen from federal taxpayers or beneficiaries. Jean-Rene argues that insufficient evidence proved he knew the Treasury checks he negotiated were stolen or fraudulent and that his indictment should have been dismissed or a new trial granted because the government failed to disclose the transcript of a special agent's testimony before the grand jury. Jean-Rene also argues that the enhancement of his sentence for obstruction of justice violated his rights under the Fifth and Sixth Amendments. We affirm.

Ample evidence proved that Jean-Rene knew the checks he negotiated had been stolen or had been issued for fraudulent tax returns. Coconspirator Evens Francois testified that he sold Jean-Rene several stolen and fraudulent Treasury checks for 50 percent of their face value and that he forged the endorsements for some of those checks. *See* 18 U.S.C. § 371. Text messages between the coconspirators, bank records, and canceled checks proved that Francois received 11 payments from Jean-Rene equaling half of the amount of seven Treasury checks

2

that Jean-Rene and his wife deposited in bank accounts for their bail bonding company. The records also established that Jean-Rene and his wife paid Francois and depleted their company bank accounts soon after making their deposits. Payees for the seven Treasury checks testified that they had no affiliation with Jean-Rene or his wife, had not obtained bail bonds from the couple, had not endorsed the checks they deposited, and had not filed federal tax returns for the fraudulent tax refund checks the couple deposited. *See Barnes v. United States*, 412 U.S. 837, 843–45 (1973) (affirming instruction that jury can infer guilty knowledge from defendant's negotiation of stolen Treasury checks payable to persons he did not know and that he had no plausible explanation for possessing); *United States v. Wilson*, 788 F.3d 1298, 1309–10 (11th Cir. 2015) (affirming conviction for converting Treasury checks when defendant deposited multiple refund checks issued for fraudulent tax returns). Jean-Rene's banks reclaimed the proceeds of at least three Treasury checks and twice notified Jean-Rene in writing that the endorsements on the Treasury checks had been forged. Jean-Rene responded by changing banks. Taken together, sufficient evidence proved that Jean-Rene knew the checks he deposited were stolen and fraudulent.

Jean-Rene's testimony "added further weight to the prosecution's case." *See United States v. Margarita Garcia*, 906 F.3d 1255, 1274 (11th Cir. 2018), *cert. denied sub nom. Garcia v. United States*, 139 S. Ct. 2027 (2019). Jean-Rene

3

testified that he accepted the Treasury checks as payments for bail bonds, but he could not account for records kept by his sureties that showed he did not issue bail bonds to any of the payees. *See id.* ("An explanation or denial offered by a defendant at trial that the jury finds implausible or false may 'form a sufficient basis to allow the jury to find that the defendant had the requisite guilty knowledge.'"). Jean-Rene also testified about an elaborate, undocumented system that involved writing checks to himself and his wife that he used to reimburse customers whose Treasury checks exceeded the cost of their bail bonds. And Jean-Rene testified that Francois bought cars that Jean-Rene repaired who then collected the purchase price from the buyers and paid Francois the balance remaining after deducting the costs of the repairs. The jury was entitled to discredit Jean-Rene's implausible testimony and treat it as substantive evidence of his guilt. *See United States v. Brown*, 53 F.3d 312, 314 (11th Cir. 1995).

The district court did not abuse its discretion by denying Jean-Rene's motion to dismiss his indictment or for a new trial. The nondisclosure of special agent Chris Hall's grand jury testimony did not warrant relief under *Giglio v. United States*, 405 U.S. 150 (1972), the Jenks Act, 18 U.S.C. § 3500(b), or *Brady v. Maryland*, 373 U.S. 83 (1963). Agent Hall testified that he investigated why Jean-Rene negotiated tax refund checks issued to other persons and that two payees confirmed Jean-Rene did not have permission to file their tax returns. Jean-Rene

4

does not contend that any of Agent Hall's statements were "actually false," as required to prove a violation of *Giglio. See Maharaj v. Sec'y for Dep't of Corr.*, 432 F.3d 1292, 1313 (11th Cir. 2005). Even if, as Jean-Rene argues, Agent Hall's testimony "left a misleading impression that Mr. Jean-Rene had purportedly filed fraudulent tax returns," any error in withholding Agent Hall's grand jury testimony was harmless. Nondisclosure of the testimony did not handicap Jean-Rene's defense or affect the outcome of his case. *See United States v. Jones*, 601 F.3d 1247, 1266–67 (11th Cir. 2010); *Giglio*, 405 U.S. at 154. Jean-Rene was convicted of identity theft and converting Treasury checks, not filing fraudulent tax returns. Had Jean-Rene questioned Agent Hall about his grand jury testimony, the government could have presented evidence that Jean-Rene had filed personal tax returns that were fraudulent. And the evidence of Jean-Rene's guilt was overwhelming. Testimony from 26 witnesses, numerous records, and text messages between Jean-Rene and his coconspirators proved that he purchased Treasury checks that were stolen or fraudulent and negotiated those checks to enrich himself and his coconspirators. Jean-Rene also argues that the district court *sua sponte* should have held an evidentiary hearing on his motion, but we will not consider an argument that Jean-Rene raised for the first time in his reply brief. *See United States v. Britt*, 437 F.3d 1103, 1104–05 (11th Cir. 2006).

5

Jean-Rene concedes that his challenge to the enhancement of his sentence for obstruction of justice is foreclosed by our precedents in *United States v. Dunnigan*, 507 U.S. 87 (1993), and *United States v. Dobbs*, 11 F.3d 152 (11th Cir. 1994). Jean-Rene does not dispute that he committed perjury. As we held in *Dobbs*, "the enhancement for obstruction of justice through perjury does not punish a defendant for testifying, but rather 'is part of a sentencing scheme designed to determine the appropriate type and extent of punishment after the issue of guilt has been resolved.'" *Id.* at 154 (quoting *Dunnigan*, 507 U.S. at 94). We are bound by that precedent. *United States v. Whyte*, 928 F.3d 1317, 1337 (11th Cir. 2019).

We **AFFIRM** Jean-Rene's convictions and sentence.